**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **TOM F. WEISS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 4:15-cv-01893-NCC** |
| ) | |
| **NANCY A. BERRYHILL** ) | |
| **Acting Commissioner of Social Security,**[1] ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM AND ORDER

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision

of the Commissioner denying the application of Tom F. Weiss ("Plaintiff" or "Weiss") for

Disability Insurance Benefits ("DIB") and a period of disability under Title II of the Social

Security Act ("the Act"), 42 U.S.C. §§ 401 *et seq.*, and for Supplemental Security Income

("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq.* Plaintiff has filed

a brief in support of the Complaint (Doc. No. 16), Defendant has filed a brief in support of the

Answer (Doc. No. 23) and Plaintiff has filed his Reply (Doc. No. 24). The parties have

consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to Title

28 U.S.C. § 636(c) (Doc. No. 8).

## I. PROCEDURAL HISTORY

Plaintiff filed his applications for DIB, period of disability and SSI in early 2012. (Tr.

134-151). Plaintiff was initially denied on July 10, 2012. (Tr. 59-67). A Disability Determination

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d)
of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting
Commissioner Carolyn W. Colvin as the defendant in this suit. No further action needs to be
taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security
Act, 42 U.S.C. § 405(g).

Explanation was sent on that date to Plaintiff, signed by single decision maker ('SDM') Terri Stendeback, with consulting evaluations by Robert Cottone, Ph.D., and Michael Ditmore, M.D. *Id* . Plaintiff filed a Request for Hearing before an Administrative Law Judge ("ALJ") on August 23, 2012. (Tr. 90). That hearing took place on February 13, 2014, with participation by Plaintiff's counsel and Delores Gonzalez, a vocational expert. (Tr. 37-57).

Subsequent to the hearing, Plaintiff's counsel requested an additional thirty days to submit additional evidence into the record, though it appears that counsel chose not to supplement the record at that point after reviewing the additional evidence. (Tr. 226-227). The ALJ found Plaintiff not disabled and entered a decision to that effect on May 21, 2014 (Tr. 20-36). Plaintiff in turn filed a Request for Review of Hearing Decision/Order on June 11, 2014, putting the matter in front of the Appeals Council. (Tr. 19). On July 30, 2015, the Appeals Council denied Plaintiff's request for review (Tr. 15-18). Additional evidence was admitted to the record and the decision of the Appeals Council reopened, although it again denied the request for review on October 29, 2014. (Tr. 1-7). As such, the ALJ's decision stands as the final decision of the Commissioner. This suit followed.

## II. BACKGROUND

### A. Testimony

At the time of the hearing, Plaintiff[2] was a 50 year-old man born in Poland, who came to the United States at around age 20. (Tr. 40, 143). He is a naturalized citizen. (Tr. 40). He is a college graduate, having attended Maryville University. *Id.* Plaintiff's primary employment has been as a mortgage banker, which included both working for established companies and attempting to start his own mortgage banking company. (Tr. 41-44). Weiss has claimed an initial onset date for his disability of April 1, 2011. (Tr. 143, 146). He has not engaged in substantial

---

[2] Formerly Tomas Franziszek Wojcik.

gainful activity since that date. (Tr. 25). Plaintiff did file for unemployment after the alleged

onset, and stated in April 2012 that he continued his efforts to get a job. (Tr. 157-159, 192).

Plaintiff cited a number of physical and mental conditions which he alleged limited his

ability to work: Short-term memory loss, hypertension, bipolar disorder, "extreme" diabetes,

peripheral neuropathy in his hands and feet, shortness of breath, a heart attack in 2009, inability

to see at night, fibromyalgia, and "asthma and damage to lungs." (Tr. 175). Determining

Plaintiff's social and medical history of record is somewhat problematic because the reports

differ as described more fully below. Both parties appear to at least acknowledge that Plaintiff

may be an unreliable witness, although the Commissioner views this as grounds for finding

Plaintiff's claims lacking in credibility, while Plaintiff's counsel argues that the inconsistencies

are themselves evidence of his cognitive issues.

At the hearing in front of the ALJ, Plaintiff testified that he had "heart problems" and a

stroke while in Europe in 1999, and that he spent two years out of work recovering. (Tr. 40-41).

He also stated that he had a heart attack in the United States in approximately 2006, and a second

stroke seven or eight months after that. (Tr. 44-45). Plaintiff also testified at the ALJ hearing that

he suffers from high blood pressure, which is normally controlled by medication but can get up

to 220/140 and remain at that level. (Tr. 48).

Plaintiff also testified at the hearing that he has "extreme diabetes," with "high sugar

levels of 500." Plaintiff stated that he was taking medication to treat his diabetes in the form of

"three shots a day each week." (Tr. 47). Plaintiff represented in connection with his application

that his medications included insulin shots. (Tr. 224). However, it appears that no one ever

prescribed insulin for Plaintiff; and the only mention of insulin is less than six months before the

hearing when Plaintiff refused to be treated with it. (Tr. 322).

At the hearing, Plaintiff stated that he had joint pain since approximately 2010, describing his joints to feel like they are "on fire" and sometimes preventing him from getting out of bed. (Tr. 47). He stated that he had ultrasounds and "over 100 x-rays" related to the pain.[3] *Id.* When asked further about the pain, he stated that he has numbness and tingling in his hands and feet, generally on the left side of his body. (Tr. 49).

Plaintiff's description of his physical pain is tied to his mental health issues. He states that he is bipolar. (Tr. 50). He described both the physical pain and mood swings as coming on three to four times a day, causing him to stay in bed for extended periods. *Id.* Plaintiff also described losing chunks of time, saying that "sometimes three weeks pass by and you just wake up and it's dark. And you didn't realize that, you know, three weeks out of your life are gone." *Id.* Plaintiff stated that he saw a psychiatrist who told him that sometimes he has "a break with reality, and [he] think[s] that it's now, but it's actually the past." (Tr. 53). He stated that the medications he was taking for depression and mood swings helped him on a temporary basis. (Tr. 50-51).

Plaintiff also testified that he has trouble focusing and concentrating, and that he has memory loss. He alleged that these issues caused him to take "two or three years" to complete a task that "used to take [him] an hour to do[.]" (Tr. 53). He also stated that his lack of memory contributed to the loss of jobs described below, his inability to keep appointments, and his tendency to either fail to take his medications or take an extra dose. *Id.*

### B. Medical Records

On September 29 2009, Plaintiff began seeing Carla Enyart, M.S., L.P.C., for testing related to possible bipolar disorder. (Tr. 369-76). Based on his intake sheet, it appears that

---

[3] The medical records contained in the record show only one set of x-rays (and two CT scans) after an automobile accident, discussed below, and the only ultrasounds are of his testicles.

Plaintiff was referred for testing by his primary care physician, Dr. Wan-In Lin Koo, D.O. (Tr. 370-371). He continued seeing Enyart through October 22, 2009 for approximately five visits. Enyart's session notes appear to cast doubts as to whether Plaintiff is bipolar, positing the possibility that he had depression, mood swings and Attention Deficit Hyperactivity Disorder. (Tr. 374). In his initial screening form, Plaintiff indicated that he "often" had racing thoughts and feelings of being overwhelmed, and "sometimes" had (among other things) difficulty concentrating, pounding of the heart, butterflies in his stomach, fear of being alone or isolated and unexpected panic spells. (Tr. 372-373). Plaintiff stated that he "never" had tingling or numbness in his toes or fingers. (Tr. 372). During Plaintiff's first office visit, Enyart noted that his concentration appeared to be impaired and he appeared anxious. (Tr. 374).

On January 5, 2010, Plaintiff saw Dr. Koo and he complained of generalized body aches. (Tr. 379). Dr. Koo diagnosed Plaintiff with bilateral hip pain, paresthesia of the lower extremity, multifocal joint pain, mixed hyperlipidemia, hyperglycemia, bipolar disorder and post-nasal drainage. *Id.* The notes state that the hyperglycemia and hyperlipidemia were diagnosed in 2008, a mole was noted in May 2009, and the bipolar diagnosis was entered in July of 2009, prior to the referral to Enyart for testing. *Id.* No mention is made of any previous strokes or heart attacks. He had blood pressure of 120/72, and weighed 212 pounds. (Tr. 380). The only notes regarding medications are Zyrtec for the post-nasal drip and discontinuance of Strattera (an ADHD medication) after two and a half months. (Tr 382-383). Dr. Koo ordered a number of lab tests during this visit, but no results are included in the records.

On October 6, 2010, Plaintiff saw Dr. Koo for a physical, where he reported "[f]eeling fine." (Tr. 279). He told Dr. Koo that he had refurbished his $3.5 million Wildwood home, sold it within a week but then revoked the contract. (Tr. 279). He reported that his mood had been

fine, and Dr. Koo noted that he was alert and oriented. *Id.* His blood pressure was 135/74 at this visit. (Tr. 281).

On March 8, 2011, Dr. Koo again saw Plaintiff for knee and joint pain, and to get labs. (Tr. 271). Plaintiff reported to Dr. Koo that he had been moody and "changes [his] mind frequently," including selling his Wildwood home (for $1.6 million in this telling) and then changing his mind that evening. (Tr. 271). Plaintiff also reported being "more forgetful." *Id.* Dr. Koo added a diagnosis of new-onset diabetes, after the subsequent lab work showed a blood glucose level of 203 mg/dL. (Tr. 272, 275). Plaintiff was also referred to a psychiatrist to address the reported mood swings and memory loss, although he indicated that he did not want to take daily medication. (Tr. 272). His blood pressure at this visit was 136/72. (Tr. 271).

On April 8, 2011, Plaintiff was seen by Roula Al-Dahhak, M.D., for sensory and motor nerve conduction studies. (Tr. 417, 244). Dr. Al-Dahhak recorded an impression of mild demyelinating neuropathy. (Tr. 259, 418). Dr. Al-Dahhak prescribed gabapentin and recommended a follow-up study within six month, although there is no record of a second test. (Tr. 259). Plaintiff reported that his symptoms (numbness, tingling and weakness in left hand, tingling in his left lower leg) started two months prior. (Tr. 260). He also reported pain in his neck and joints, starting approximately eight months earlier. *Id.* Additionally, Plaintiff reported that within the previous 90 days, he had experienced changes in vision, dizziness and light-headedness. (Tr. 261). His blood pressure was 120/70 at this visit, and he was alert, awake, responsive, oriented and attentive. (Tr. 261-262). All of his reflexes and muscle strength tests were normal. (Tr. 262).

On May 2, 2011, Plaintiff contacted Dr. Koo for a "Medication Refill." (Tr. 386). A table listing apparent test results from a prior, March 2011 visit shows a blood glucose level of 203.

(Tr. 387). He was also diagnosed with diabetic peripheral neuropathy, pursuant to the nerve conduction studies. (Tr. 386). A series of telephone conversations are memorialized in these records, during which Dr. Koo asked what blood sugar and blood pressure readings Plaintiff had at home, to which Plaintiff claimed to have lost his notes, and Dr. Koo stated that "[i]f he checked his blood pressure and blood sugars, he must have some idea what [h]is numbers are." (Tr. 387-88). Plaintiff then told Dr. Koo's office that his blood sugars were "about 200 fasting" and his blood pressure was "approximately" 140/90. (Tr. 388). Based on these reports, Dr. Koo increased Plaintiff's apparently preexisting prescriptions for metformin and ramipril for his diabetes and hypertension, respectively. He also mandated that Plaintiff check his blood pressure daily, check his blood sugars twice daily, and report back the results in one week. *Id.* No record of those reports are in the transcript. The after-visit summary reveals "discontinued" medications of venlafaxine (generally used to treat depression or fibromyalgia), simvastatin (for cholesterol) and gabapentin (for nerve pain). (Tr. 390).

The next record from Dr. Koo also reflects a telephone encounter, this time on February 24, 2012, again for medication refills. Dr. Koo's notes reflect that he had not seen Plaintiff for approximately 10 months. (Tr. 393). The notes also suggest that Plaintiff apparently "ha[d]n't taken any of his meds in months[.]" *Id.* Dr. Koo restarted him on gabapentin, metformin and ramipril. *Id.* Plaintiff was scheduled for an appointment on February 28, 2012, at which point Dr. Koo planned to discuss restarting the venlafaxine and simvastatin for Plaintiff's bipolar disorder and heart disease, respectively. No records reflecting such a visit are included in the transcript. However, on March 1, 2012, Dr. Koo received a questionnaire, apparently asking about Plaintiff's limitations and impairments. (Tr. 398). Dr. Koo seems to have declined to fill out the questionnaire and suggested that a Physical Medicine and Rehabilitation specialist see him. *Id.*

Plaintiff was next seen by Dr. Koo on April 16, 2012, complaining of leg pain, problems taking deep breaths, and memory loss. (Tr. 402). Apparently, Dr. Koo had previously sent a letter of termination to Plaintiff, which Plaintiff denied receiving. (Tr. 403). The termination was due to his noncompliance. (Tr. 412). Plaintiff stated that he "[u]nderstands that he has been noncompliant with his medical care, and states that he will establish care with a new PCP as soon as possible." (Tr. 403). Plaintiff also told Dr. Koo that he "[h]asn't been taking all of his medications for at least a few weeks now." *Id.* Plaintiff stated that he had numbness and weakness in both legs, left worse than right, as well as shortness of breath and "heart coming out of [his] chest" when running or walking. *Id.* Plaintiff claimed that he had been having mood swings, depression, anxiety and forgetfulness. (Tr. 403). However, Plaintiff was reported as alert and oriented during the exam. *Id.* Plaintiff also reported that he had been evaluated at St. John's Mercy Hospital, including head imaging, in January 2012. *Id.* There is no record of such an evaluation in the transcript, and in fact Mercy responded to the Disability Determinations record request stating that it had no records for Plaintiff from April 2010 to March 2012. (Tr. 290, 294). At the office visit, Plaintiff had a blood pressure of 120/78, causing Dr. Koo to discontinue the prescription of ramipril. *Id.* Dr. Koo also ordered a number of blood and urine tests, which showed hyperlipidemia, elevated BUN/creatinine, and blood glucose levels of 289 mg/dL. (Tr. 408).

On June 25, 2012, Plaintiff underwent a Consultative Examination by Dr. Inna Lee Park, M.D. (Tr. 297). Plaintiff's chief complaints were listed as hypertension, diabetes, coronary artery disease, asthma, lung problems, fibromyalgia, bipolar disorder and memory problems. *Id.* Plaintiff claimed to have been "hospitalized two or three times a year for the last five years" due to malignant hypertension, the last of which was in March 2012 in Lake St. Louis with a blood

pressure reading of 220/180. (Tr. 297, 299). He claims at least some of these hospitalizations were at St. John's. *Id.* He also estimated his medication compliance rate at about 90%, due to sometimes forgetting to take his medication. (Tr. 297). Plaintiff also told Dr. Park that he had been diagnosed as diabetic approximately four years prior, and that an eye doctor had told him he had diabetic changes in his eyes. (Tr. 297-298). He attributed some of the numbness and tingling in his left arm and leg to diabetic neuropathy and some to a stroke. (Tr. 298). Plaintiff claimed that he checks his blood sugar three times a day with a range from 229 to 560, averaging about 280. *Id.* He claimed to have coronary artery disease, having had a myocardial infarction (heart attack) in 2004 while in the Czech Republic. *Id.* The notes also contain mention of an MI in 2009 (Tr. 297, 299). Plaintiff claimed that he had his last stress test in 2011. *Id.* Plaintiff claimed to have a pulmonary function test in 2011, which resulted in a diagnosis of asthma, and that he had been treated for pneumonia in 2011. *Id.* As to the fibromyalgia, Plaintiff claims to have had x-rays done two years before, which showed arthritis in his joints. (Tr. 298). Dr. Park noted that Plaintiff did not seem to understand the symptoms of fibromyalgia, "as his response to my questions is somewhat variable." (Tr. 298-299). He stated that his fibromyalgia causes pain, numbness and tingling in his joints. (Tr. 299). Plaintiff stated to Dr. Park that he had a stroke in 2008 or 2009 which left him hospitalized for three days and affected the left side of his body. *Id.* During the examination, Dr. Park reports that Plaintiff was alert, not drowsy, with good knowledge of his medical issues, that his lungs were clear, a normal range of motion and could "squat 100 percent recovering on his own." (Tr. 299-300). Her examination found decreased sensation to light touch from mid-calf to toe on the left and decreased proprioception at both toes. (Tr. 300).

On the same day, Plaintiff also underwent a consultative examination for his psychological claims conducted by Kimberly Buffkins, Psy.D. (Tr. 308). Dr. Buffkins described Plaintiff as a "fair historian." *Id.* Plaintiff told her that he had been seen by a psychiatrist and had received mental health counseling from 2010 until January or February of 2012. (Tr. 308). He reported feeling depressed 90 percent of the day, every day, but also stated that he sometimes has manic episodes where he "talk[s] nonstop," needs only an hour or two of sleep and feels "on top of the world[.]" *Id.* Plaintiff also describes impaired judgment during these manic episodes, including giving away $200,000, selling his car to pay an electric bill and crashing a car. (Tr. 308-309). He also states that he has been divorced four time, and that he "lost 10 jobs in the past 5 years." (Tr. 309). In this interview, Plaintiff stated that he had a "history of heart attack and stroke in 2007/2008 with subsequent memory problems[.]" *Id.* Dr. Buffkins found him to be alert on the day of the examination, cooperative and calm, tearful at times, mildly depressed with a slightly flat affect, and a logical, relevant thought process. (Tr. 309-310). His responses to the orientation and cognition tasks were mixed, giving only three numbers when asked to remember a six-digit span. (Tr. 310). He was able to complete simple calculation and was able to recall his birthplace, birthdate and social security number without issue, but could only name two past presidents when asked for four. *Id.* Plaintiff stated that he lives with friends and does not do household chores, pay bills, cook or shop for groceries, although he does drive. *Id.* He stated that he gets along with family, friends and people in general. *Id.* Dr. Buffkins reported that Plaintiff's concentration was fair, and that his persistence and pace were adequate. (Tr. 311). She rated his prognosis as fair, with a chance to improve if given appropriate interventions, and that he appeared "capable of managing supplemental funds." *Id.*

Subsequently, Plaintiff established care at the People's Health Center on February 20, 2013. (Tr. 350). The examination noted that he was negative for fatigue, negative for chest pain, negative for vision changes and vision loss. *Id.* The notes also state that he was "negative for depression and psychiatric symptoms[,]" was oriented and demonstrated "appropriate" mood and affect. (Tr. 351-352). He was diagnosed with Type II diabetes, although he was advised that he should go to the emergency room if he had chest pain, shortness of breath, extremity numbness or tingling. (Tr. 352). He was placed back on metformin and told to test his blood sugar three times a day. *Id.* Tests conducted that day showed a blood glucose level of 165 mg/dL. (Tr. 157).

Plaintiff had a nurse visit at People's Health Center on April 11, 2013 to review his test results. (Tr. 324). His blood pressure was elevated at 149/91. He stated that he was at a "0/10" on the Numeric Pain Intensity Scale. (Tr. 325).

Plaintiff had a follow-up visit with Dr. Rosa Galvez-Myles, M.D., at the People's Health Center on September 18, 2013. (Tr. 320). Plaintiff reported measuring his blood glucose at over 200 at home, and stated that he "is not taking his psychiatric medication." (Tr. 320). He self-reported as having bipolar disorder, though Dr. Galvez-Myles appears to have treated it as depression, based on his Patient Health Questionnaire. (Tr. 321, 323) Plaintiff reported having a depressed mood, difficulty concentrating, difficulty falling asleep, anhedonia and feelings of guilt. (Tr. 321). During the exam itself, Plaintiff presented as oriented, with appropriate mood and affect. (Tr. 322). Dr. Galvez-Myles offered insulin to Plaintiff to lower his blood sugar, but he refused. *Id.* Plaintiff also described being in pain on the order of 5/10. *Id.* In addition to the metformin, Plaintiff was prescribed Celexa for depression and lisinopril for his blood pressure. *Id.* He was told to keep a blood pressure and blood glucose log and bring it to the next appointment. (Tr. 323).

Plaintiff was seen at St. Luke's Hospital on October 10, 2013, after being involved in a motor vehicle accident. (Tr. 333). The ER noted a blood pressure of 148/99. *Id.* The only preexisting problem noted is the diabetes. (Tr. 335). Plaintiff was noted as having mild tenderness in his left ribs, left flank and upper thoracic area of his back. (Tr. 335-336). CT scans of his head, abdomen and pelvis were negative, and x-rays of his cervical spine showed no fracture. (Tr. 336). Plaintiff refused an additional x-ray of his thoracic spine because he was "concerned about radiation exposure." *Id.*

Plaintiff followed up in November 2013 with People's Health Center, requesting a refill of his medications and the addition of pain medication. (Tr. 316). Plaintiff stated he had been in a car accident, which resulted in a bruised left side, broken nose and a feeling "like spine is out of alignment." *Id.* He also stated that his blood glucose levels had been between 300-500 recently. *Id.* The notes show that Plaintiff stated the Celexa had helped his depression, but that he still was depressed, had difficulty concentrating, was dizzy and had suicidal ideation. (Tr. 317). His blood pressure was down. *Id.* He rated pain as 9/10, although he had a normal range of motion, with normal muscle strength and no swelling or redness in his joints. (Tr. 318). Glipizide and amitriptyline were added to his existing medications. *Id.*

Finally, Plaintiff was seen at People's Health Center on December 16, 2013. (Tr. 312). Plaintiff claimed he had a 110-degree fever for two and a half weeks, but that he did not go to the emergency room and that he felt better. *Id.* He also claimed that he had "constant pain in joints [for] about 2-3 years." *Id.* He claimed the pain was worst in the neck, spine, back and hips, and that he wanted a note that he could not drive, apparently to convince his ex-wife that he could not pick up his kids. *Id.* Plaintiff also noted "[l]ots of blood" in his stool since he increased his metformin dosage, although he had some blood six months prior. *Id.* His blood pressure was

again elevated, and he described himself as in 6/10 pain. (Tr. 314). His blood glucose that day was 344. (Tr. 331).

### C. Third-Party Function Report, Consultants and Disability Determination Explanation

In addition to his own account of his condition, Plaintiff also obtained a Function Report from a friend, Nichole Oliver. (Tr. 184). Oliver stated that she had known Plaintiff for six years at that point, and saw Plaintiff 2-3 times per week. *Id.* No indication is given that. Oliver lived with Plaintiff or observed him on a daily basis as to his domestic activities. She stated that Plaintiff had "difficulty" getting and keeping employment, and that he "suffers from dissociation which keeps him from functioning on a daily level." *Id.* She reported that he cared for two daughters from previous marriages every other weekend, Wednesdays and holidays.[4] (Tr. 185). She stated that he was able to perform cleaning, laundry, household repairs, ironing and mowing. (Tr. 186). Oliver also stated that he needed to be reminded to take his medication, eat and check his blood sugar, and that he had difficulty focusing on and completing tasks such as the activities of daily life activities listed. *Id.* She stated that Plaintiff can drive and go out alone, goes shopping, can pay bills, can count change, can handle a savings account and a checkbook. (Tr. 187). She does note that he sometimes has trouble with overdrafting his account and failing to pay bills in a timely manner. *Id.* Oliver's account also states that he has trouble following instructions and completing tasks "because of dissociation, depression and isolation." (Tr. 189). She also stated that he can follow spoken instructions better than written instructions, and has trouble maintain relationships, getting along with others and interacting with authority figures. *Id.*

---

[4] Plaintiff stated that he has six children. (Tr. 50). It is unclear if Oliver was only aware of these two daughters, or if she meant that he has partial custody of only two of them.

As stated above, in addition to the consultative examinations by Dr. Park and Dr. Buffkins, Plaintiff's claims were also evaluated by consultants Robert Cottone, Ph.D., and Michael Ditmore, M.D., as part of the initial claim determination process. (Tr.59-67). Their analyses were then incorporated in the Disability Determination Explanation ("DDE") by Ms. Stendeback.

Dr. Ditmore performed a Physical Residual Functional Capacity Assessment by evaluating Plaintiff's medical records and consultative examinations. (Tr. 65). Dr. Ditmore determined that Plaintiff did have exertional limitations and is restricted to occasionally lifting and carrying 50 pounds, frequently lifting 25 pounds, standing or walking six hours out of an eight-hour workday, and sitting six hours out of an eight-hour workday. *Id.* He found that Plaintiff had no postural or manipulative limitations, such as stooping, kneeling or grasping. *Id.*

Dr. Cottone conducted the Psychiatric Review Technique for Plaintiff's claims related to mental impairments. (Tr. 63-64). He noted that he demonstrated mild restriction on activities of daily living, mild difficulties in maintaining social functioning and mild difficulties in concentration, pace or persistence. (Tr. 63). Dr. Cottone notes several inconsistencies between Plaintiff's own account of his daily functionality and psychological condition and those of other sources, including the consultative examination by Dr. Buffkins and Oliver's account. (Tr. 64). Among these conflicts was whether Plaintiff can go out alone, whether he can shop, and whether he does any better with spoken instructions than written. (Tr. 64). Overall, Dr. Cottone rated Plaintiff's mental impaiments as non-severe. *Id.*

### III. DECISION OF THE ALJ

The ALJ issued his decision in this matter on May 21, 2014. (Tr. 23-32). In that decision, the ALJ determined that Plaintiff meets the insured status requirements of the Social Security

Act through December 31, 2013, and had not engaged in substantial gainful activity since the alleged onset date of April 1, 2011. (Tr. 25). The ALJ found Plaintiff has the severe impairments of "myalgia and bipolar disorder," non-severe impairments of intermittent mild neuropathy, hypertension, diabetes mellitus and borderline obesity, and that no impairment or combination of impairments met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.*

The ALJ found that Plaintiff's testimony was "not fully credible." (Tr. 30). Throughout the decision, the ALJ noted inconsistencies between Plaintiff's accounts of his condition and other evidence in the record, including medical records, Oliver's account of his capabilities and even his own prior descriptions. The ALJ also found that Plaintiff's employment history tended to undermine his credibility. *Id.* Not only were there significant gap periods, Plaintiff both applied for unemployment benefits and testified that he continued to look for work after the alleged onset date. *Id.* Although neither is dispositive on the issue of credibility, they both show Plaintiff holding himself out (explicitly or implicitly) as willing and able to work, which weaken his claims in this matter that he is completely unable to work.

After considering the entire record, the ALJ determined Plaintiff has the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b), including lifting and carrying ten pounds frequently and 20 pounds occasionally, sitting for at least six hours out of an eight hour work day, and standing/walking at least six hours out of an eight hour work day. (Tr. 27). The ALJ further found that he is unable to perform work that requires climbing on ropes, ladders, or scaffolds but can occasionally climb on ramps and stairs, and can only occasionally engage in stooping, kneeling, or crouching, and should avoid concentrated exposure to extreme cold and unprotected heights. (*Id.*). This is actually more

restrictive than the RFC suggested by Dr. Ditmore in his evaluation, but the ALJ chose to give Plaintiff "the benefit of the doubt" in formulating the final RFC determination. (Tr. 29).

In terms of mental requirements, the ALJ found that he is able to understand, remember and carry out at least simple instructions and non-detailed tasks. *Id.* Additionally, the ALJ determined that Plaintiff should avoid constant/regular contact with the general public and more than infrequent handling of customer complaints. (*Id.*). Again, the ALJ departed from the evaluation given by the state consultant in the DDE in Plaintiff's favor, finding that "[a]lthough this opinion was consistent with the evidence of record at the time it was rendered, subsequent evidence supports a finding that the impairment is severe." (Tr. 30). The ALJ found that he was not able to perform his past work. *Id.*

At the hearing, the ALJ used this RFC to pose hypothetical questions to Delores Elvira Gonzalez, a vocational expert. (Tr. 53-56). Specifically, the ALJ asked Gonzalez whether there were jobs which Plaintiff could perform, given the described RFC as well as his age, education, and work experience. She was also asked whether those jobs exist in significant numbers in the national and local economies. Gonzalez stated that based on the RFC as formulated, Plaintiff was able to perform jobs such as housekeeping cleaner and marker.[5] (Tr. 54). She further testified that there were an estimated 134,844 jobs nationally (2,836 in Missouri) for housekeeping cleaning and 271,192 jobs nationally (4,968 in Missouri) for marking. *Id.* Therefore, the ALJ found that there are jobs that exist in significant numbers in the national economy that Plaintiff

---

[5] A "marker" (209.587-034) is defined by the Dictionary of Occupational Titles as a person who "[m]arks and attaches price tickets to articles of merchandise to record price and identifying information: Marks selling price by hand on boxes containing merchandise, or on price tickets. Ties, glues, sews, or staples price ticket to each article. Presses lever or plunger of mechanism that pins, pastes, ties, or staples ticket to article. May record number and types of articles marked and pack them in boxes. May compare printed price tickets with entries on purchase order to verify accuracy and notify supervisor of discrepancies. May print information on tickets, using ticket-printing machine."

can perform. (Tr. 31-32). Thus, the ALJ concluded that a finding of "not disabled" was appropriate. (*Id.*). The Appeals Council denied review of the decision, and thus the denial stands as the determination of the Commissioner. (Tr. 1-18). Plaintiff "challenges whether the ALJ's RFC accounted for Plaintiff's difficulty with concentration and memory, and whether the ALJ properly evaluated Plaintiff's credibility." (Doc. No. 23 at 4).

For the following reasons, the Court finds that the ALJ's determination that Plaintiff was not fully credible was supported by substantial evidence, and that his formulation of the RFC adequately accounted for the limitations on concentration and memory to the extent he found them credible. Accordingly, the Court affirms the findings of the ALJ as adopted as final by the Commissioner.

### III. LEGAL STANDARD

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities. . . ." *Id.* "'The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work.'" *Page v. Astrue*, 484

17

F.3d 1040, 1043 (8th Cir. 2007) (quoting *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001), citing *Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996)).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. *Id.*

Fourth, the impairment must prevent the claimant from doing past relevant work. 20 C.F.R. §§ 416.920(f), 404.1520(f). The burden rests with the claimant at this fourth step to establish his or her RFC. *Steed v. Astrue*, 524 F.3d 872, 874 n.3 (8th Cir. 2008) ("Through step four of this analysis, the claimant has the burden of showing that she is disabled."). The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f).

Fifth, the severe impairment must prevent the claimant from doing any other work. 20 C.F.R. §§ 416.920(g), 404.1520(g). At this fifth step of the sequential analysis, the Commissioner has the burden of production to show evidence of other jobs in the national economy that can be performed by a person with the claimant's RFC. *Steed*, 524 F.3d at 874 n.3. If the claimant meets these standards, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." *Young v. Apfel,* 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). *See also Harris v. Barnhart*, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)); *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."). Even if a court finds that there is a preponderance of the evidence against the ALJ's

decision, the decision must be affirmed if it is supported by substantial evidence. *Clark v. Heckler*, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002). *See also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).

It is not the job of the district court to re-weigh the evidence or review the factual record *de novo*. *Cox*, 495 F.3d at 617. Weighing the evidence is a function of the ALJ, who is the fact-finder. *Masterson v. Barnhart*, 363 F.3d 731, 736 (8th Cir. 2004). Thus, an administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently. *Krogmeier*, 294 F.3d at 1022.

To determine whether the Commissioner's final decision is supported by substantial evidence, the court is required to review the administrative record as a whole and to consider:

(1) Findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

*Brand v. Sec'y of Dep't of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980). In this case, additional evidence was presented after the ALJ rendered his decision and after the Appeals

Council had already denied review of that decision. (Tr. 1-18). The additional records are those of Enyart's counseling session in 2009 and Dr. Koo's records from 2010 to 2012. In situations where additional evidence has been submitted after the ALJ has issued a decision, the task of a reviewing court is "deciding whether the administrative law judge's determination is supported by substantial evidence on the record as a whole, including the new evidence submitted after the determination was made." *Riley v. Shalala*, 18 F.3d 619, 622 (8th Cir. 1994) (citations omitted).

## IV. DISCUSSION

### A. Credibility

The Court will first consider the ALJ's credibility analysis and determination, as the evaluation of Plaintiff's credibility was essential to the ALJ's determination of other issues, including Plaintiff's RFC. "Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility." *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001). *See also Wildman v. Astrue*, 596 F.3d 959, 969 (8th Cir. 2010) ("[Plaintiff] fails to recognize that the ALJ's determination regarding her RFC was influenced by his determination that her allegations were not credible.") (*citing Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005)); 20 C.F.R. §§ 404.1545, 416.945 (2010).  In assessing a claimant's credibility, the ALJ must consider: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.  *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008); *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).  ALJs need not explicitly discuss each *Polaski* factor. *Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011) (*citing Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005). "The credibility of a claimant's subjective

testimony is primarily for the ALJ to decide, not the courts." *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [a court] will normally defer to the ALJ's credibility determination." *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003). *See also Halverson v. Astrue*, 600 F.3d 922, 932 (8th Cir. 2010); *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006). The Court finds that the reasons offered by the ALJ in support of his credibility determination are based on substantial evidence.

The ALJ found that although Plaintiff's medically-determinable impairments could be expected to cause the symptoms he claims, there were significant issues with his claims as to the intensity, persistence and limiting effects of those symptoms. (Tr. 28). The ALJ considered the medical records submitted and determined that there were sufficient inconsistencies with Plaintiff's subjective allegations to undermine his credibility as to his physical complaints. (Tr. 28). An ALJ may not disregard subjective allegations solely because they are not fully supported by objective medical evidence, but may afford them less weight if inconsistencies exist in the record as a whole. *See Perks v. Astrue*, 687 F.3d 1086, 1093 (8th Cir. 2012) ("The ALJ may properly discount the claimant's testimony where it is inconsistent with the record.")

A significant portion of the ALJ's credibility determination appears to turn on Plaintiff's inconsistencies and lack of supporting medical records. This situation is not helped by the addition of Plaintiff's earlier medical records after the ALJ's decision was issued—viewing the record as a whole, there is substantial evidence to support the conclusion that Plaintiff is "prone to exaggeration." (Tr. 30).

In one example, Plaintiff told Dr. Park (in an examination that he knew was related to his disability claim) that he had been "hospitalized two or three times a year for the last five years"

due to malignant hypertension, the last of which was in March 2012 in Lake St. Louis with a blood pressure reading of 220/180. (Tr. 297, 299). No records of these hospitalizations appear in the record, either directly or in Dr. Koo's office notes, which cover a significant portion of that period.

Plaintiff claimed in his hearing testimony that he had "over 100 x-rays" and ultrasounds related to his joint pain. (Tr. 47). The only records either directly produced or referred to in other physicians' office notes are one set of x-rays and two CT scans from St. Luke's Hospital emergency room after an auto accident, which had negative results, and an ultrasound of Plaintiff's testicles from St. Joseph's Hospital West, which revealed one moderate and one small hydrocele (fluid accumulation). (Tr. 235, 336). The auto accident is referred to in the corresponding PCP record from a month later (Tr. 316), whereas no mention of other hospitalizations or x-rays is made in other notes. Additionally, Plaintiff refused an x-ray of his thoracic spine on the grounds of concern over radiation exposure. (Tr. 235). The ALJ could view this as inconsistent with his claim to have had a hundred x-rays to determine the cause of joint pain that Plaintiff's doctors appear to ascribe to neuropathy.

In his disability application and in his examination by Dr. Park, Plaintiff claimed that asthma and "lung damage" limited his ability to work. No medical record contains any reference to lung damage, and asthma in mentioned in connection with seasonal allergies and post-nasal drip. Dr. Park's examination revealed clear lungs.

In his disability application, Plaintiff also claimed that he cannot see at night. When he was examined by Dr. Park, he claimed to have been diagnosed with "diabetic changes in his eyes" by "an eye doctor" who "did not recommend laser therapy yet." (Tr. 297-298). After supplementation, the record contains primary care physician notes from Plaintiff's diagnosis with

diabetes to shortly before the ALJ hearing. Only once, in Dr. al-Dahhak's note from 2011, is any change in vision referenced. (Tr. 261). Every other office note, before and after, has no mention of any vision problems at all, and several specifically note no problems with his vision. (Tr. 350).

Plaintiff claims to have suffered from at least one heart attack and two strokes, although the timing of these events is variable. At the hearing, Plaintiff claimed that he had a stroke in 1999 in Europe (accounting for his lack of employment from 1999-2001) and another in 2006-2007, six to eight months after a heart attack. (Tr. 40-41 and 44-45). In his CE with Dr. Park, he told her that he had a heart attack in the Czech Republic in 2004, another heart attack in 2009, and a stroke in 2008 or 2009. (Tr. 298-299). He claimed to have had several cardiac stress tests, the last in 2011 when he was told he needed to see a cardiologist. (Tr. 298). No records of a stress test are contained in Dr. Koo's or Dr. Al-Dahhak's notes from that period. In fact, there is no reference in any records in the transcript to either a stroke or a heart attack, except in his ALJ hearing testimony and in the CE for his disability determination. These are major health events, and for them to not even get a casual mention in his primary care notes or in his establishing-care visit with the People's Health Center provides substantial evidence for the ALJ to determine that Plaintiff's testimony was not credible.

The ALJ also noted Plaintiff's employment record, continuing efforts to find a job, and his application for unemployment benefits after the alleged date of onset of disability undercut Plaintiff's credibility. "A lack of work history may indicate a lack of motivation to work rather than a lack of ability." *Pearsall*, 274 F.3d at 1218 (*citing Woolf v. Shalala*, 3 F.3d 1210, 1214 (8th Cir. 1993). In this case, it appears that Plaintiff has a record of getting jobs, but a poor record for keeping them, given his testimony that he had lost 10 jobs in five years. Plaintiff urges that this is support for his claim that he is disabled by his loss of short-term memory and ability

to concentrate. The ALJ disagreed and that finding is supported by substantial evidence. Similarly, Plaintiff's application for work and for unemployment benefits after the alleged onset date of his disability undercut his credibility. *See Smith v. Colvin*, 756 F.3d 621, 625 (8th Cir. 2014) ("Applying for unemployment benefits adversely affects credibility, although it is not conclusive, because an unemployment applicant must hold himself out as available, willing and able to work.") This determination was only one of the bases cited by the ALJ for discounting Plaintiff's assertions.

Finally, the ALJ found that there were some inconsistencies between Plaintiff's own accounts of his daily life activities and those stated by his friend Oliver in her Third-Party Function Report. (Tr. 30). Specifically, he noted that Oliver's account of Plaintiff's activities suggest that he is significantly more functional than he alleged in his own function report and testimony. Looking at those statements, Oliver suggests that he does go shopping, can go out alone, can handle money and can do housework, household repairs and such with encouragement. (Tr.186-188). Plaintiff's own statements state that he cannot do any chores or housework, does not go shopping, cannot handle money other than counting change, and cannot go out unaccompanied. (Tr. 194-197). The ALJ accorded Oliver's statements some weight, which in turn further undercuts Plaintiff's credibility.

In summation, the ALJ's determination that Plaintiff's testimony as to the duration, intensity and severity of his subjective complaints was not fully credible is supported by substantial evidence. Both the inconsistencies in the record and the failure of the record to support many of Plaintiff's assertions about his medical history and condition as evidence that Plaintiff's subjective assertions as to his limitations are not credible.

## B. Formulation of the RFC

Plaintiff's primary attack upon the ALJ's decision is that the RFC formulated by the ALJ did not address his claims about concentration and short-term memory. Based on a review of the reasoning set forth in the ALJ's decision, as applied to the record as supplemented, the Court finds that the final RFC adequately addressed Plaintiff's mental limitations by limiting the hypothetical tasks to include simple instructions and non-detailed tasks. Based upon the objective evaluations of Plaintiff's mental abilities in the record and those credible assertions by Plaintiff as to his own condition, there was substantial evidence to support a formulation of the RFC as promulgated.

An ALJ bears "the primary responsibility for determining a claimant's RFC" and may take into account a range of evidence, from personal observation to the claimant's statements regarding his or her daily activities, but "because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010). The standard for formulating an RFC to use as the basis for a hypothetical question about whether there is work to be found for someone with a claimant's credible set of limitations, skills and experience focuses less on the cause of the issues and more with the effects those issues have on his or her capacity to perform job tasks. "The RFC must (1) give appropriate consideration to all of [the claimant's] impairments, and (2) be based on competent medical evidence establishing the physical and mental activity that the claimant can perform in a work setting." *Mabry v. Colvin,* 815 F.3d 386, 390 (8th Cir. 2016) (*quoting Partee v. Astrue*, 638 F.3d 860, 865 (8th Cir. 2011)). "The hypothetical question must capture the concrete consequences of the claimant's deficiencies." *Perkins v. Astrue*, 648 F.3d 892, 902 (8th Cir. 2011) (emphasis added).

The only objective evaluation of Plaintiff's concentration and short-term memory was that of Dr. Buffkins. In her CE, Dr. Buffkins subjected Plaintiff to a battery of exams designed to test his memory, cognition and concentration. As to the latter, she found that Plaintiff's concentration during the exam was "fair" and that his persistence and pace were "adequate." (Tr. 311). In the memory tasks, she noted "some difficulty" with his short-term memory, remembering half of a six-digit string of numbers. (Tr. 310).

The remaining evidence pointed to by Plaintiff in support of his cognitive deficits, although found within the treatment notes of medical professionals, are essentially just recorded statements by Plaintiff as to his mood, memory and concentration. The accounts of loss of memory and poor concentration from Dr. Koo's records, the People's Health Center and Ms. Enyart appear to be based on Plaintiff's assertion of those conditions, rather than direct observation. An ALJ may properly discount a treating physician's opinion insofar as it relied to Plaintiff's subjective complaints. *See Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007). Such an opinion would be given even less weight if, as here, the ALJ has found the claimant's subjective reports to be less than fully credible.

The ALJ acknowledged in his decision that Plaintiff claimed to have difficulty with his memory and ability to focus (Tr. 26, 29). Whether Plaintiff's cognitive deficits are the result of his uncontrolled diabetes, his alleged strokes, the racing thoughts attributed to bipolar disorder, or distraction caused by his joint pain, the question of how to address them in formulating an RFC remains largely unchanged as to what limitations does Plaintiff have in his ability to perform job functions. The ALJ also interpreted Dr. Buffkins' findings (despite her use of relatively positive terms like "fair" and "adequate") as "moderate limitations" in those areas. (Tr.

29). The ALJ then applied these limitations to employment by positing an RFC where Plaintiff would be limited to simple instructions and non-detailed tasks (Tr. 27).

The Eighth Circuit has held that RFC findings similar to the RFC in this case adequately captured the claimant's deficiency in memory, concentration, persistence, or pace. In *Brachtel v. Apfel*, 132 F.3d 417 (8th Cir. 1997), the claimant was determined by the ALJ to "often" have problems with concentration, pace or persistence. The Court of Appeals held that an RFC and resulting hypothetical question including a limitation that the individual "do only simple routine repetitive work, which does not require close attention to detail" was sufficient to capture and address claimant's issues in those areas. *Id.* at 421. Similarly, the Court of Appeals in *Martise v. Astrue*, 641 F.3d 909, 926 (8th Cir. 2011), found that a claimant's memory problems were adequately addressed by an RFC where she was limited to a job "requiring her to understand, remember, and carry out simple instructions and non-detailed tasks; perform in a low-stress environment; and work without public contact."

As in these cases, the RFC formulated by the ALJ in the instant case fairly met the impairments that the ALJ found credible as to his memory and concentration, and fairly incorporated those impairments into functional limitation on how much Plaintiff would be expected to remember and how many details he would have to deal with at any given time. As such, the RFC put forth in the ALJ's decision adequately addresses the credible limitations he found on Plaintiff's ability to perform tasks in a work environment.

## V. CONCLUSION

For the reasons set forth above, the Court finds that substantial evidence on the record as a whole, including the supplemental materials provided after the ALJ's decision was rendered, supports the Commissioner's decision that Plaintiff is not disabled.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**, and Plaintiff's Complaint is **DISMISSED with prejudice**.

A separate judgment in accordance with this Memorandum and Order is entered this same date.

Dated this 20th day of March, 2017.

   /s/ Noelle C. Collins
_____
NOELLE C. COLLINS
UNITED STATES MAGISTRATE JUDGE
